Mr. Swanson, you may come forward. Good morning, and you may proceed. Thank you, Your Honor. May it please the court, counsel. My name is Nathan Swanson and I am here on behalf of Appellant Darius Carter, who was convicted after a jury trial of one count of conspiracy and one count of making false statements in connection with the transfer of a firearm. Mr. Carter raised three allegations of error by the district court, and if there are no specific questions about the first two, I would use my time to concentrate on his third allegation of error, which had to do with sentencing. Specifically, Mr. Carter alleged that the district court committed error by applying sentencing guideline 2K2.1C16. That guideline increases the defendant's total offense level when the defendant used or possessed a firearm cited in the offensive conviction in connection with another offense. Mr. Carter argues that that enhancement should not have applied for three reasons. First, the VP9 in question, Heckler & Koch VP9, was not a firearm cited in the offensive conviction. Secondly, the death of Ms. Mason was not relevant conduct for the offensive conviction. And third, that the government failed to present sufficient evidence that Mr. Carter either killed Ms. Mason or used the Heckler & Koch VP9 to do so. With regards to whether or not the VP9 was a firearm cited in the offensive conviction, in United States v. Edgar, this court held that whether a firearm was cited in the offensive conviction depends on whether the firearm formed the basis for the conviction, not whether the firearm was specifically identified in the charging documents. Now, admittedly, Edgar was kind of the opposite of this case. In this case, the VP9 was identified in the charging document. In Edgar, it was not. But the principle still holds. The question is whether or not that VP9, Mr. Carter's possession of it, served as the basis of the conviction. It did not. This court's precedent says that the offense charged here is completed when the Form 4473 is submitted to the FFL with a false statement on it, regardless of whether or not a firearm is ever actually transferred. So what you're saying is that the jury never has to actually identify a firearm? Correct. And maybe you're not the right person in this argument to ask this question, but what is the purpose of identifying the firearms? Because they were also in the jury verdict, am I right? There was a special interrogatory that asked the jury to find whether or not the VP9 and the Glock 42 had been involved in the offense. So they weren't asked to find that they specifically were part of the offense, but there was a special interrogatory to them. And they did find that, yes. And what was the purpose? Was there a discussion of the inclusion of that special interrogatory prior to submission of the jury instructions? And Your Honor, I have to concede, I don't recall if they had a specific discussion of that. My assumption would be that that interrogatory was provided solely for the purposes of applying this enhancement. Were you trial counsel? I was not, Your Honor. So I couldn't tell you that. But to your first question about whether or not, what's the purpose of it? Well, in this case, it would be superfluous. Because again, it wouldn't have mattered if the firearm, the VP9 or the Glock had ever been transferred. The only question that the jury needed to find beyond a reasonable doubt to sustain a conviction was, was there a false statement made or knowingly false statement made on that form 473? Did that form identify a gun? I believe the form did identify two separate guns on there. Yes, Your Honor. The two guns that you hear? Yes. But again, if, whether or not those guns had ever been transferred, wouldn't enter into it. If the dealer had canceled the transfer, if they'd gotten a hold from the ATF, if the gun had ever been transferred, the offense still would have occurred. Both offenses, in fact. But there has to be some intent to acquire though, right? So there has to be some object of that intent to acquire. Certainly, there's some, there's some intent to acquire a firearm. I think that can absolutely be inferred. But there is an enhancement that would apply in that circumstance. The, I think they've renumbered it now, but the 2K2.1, I believe at the time it was B6B, B7 now, I believe. But that applies when somebody who has been convicted of an offense uses a firearm in any other offense, regardless of whether or not the firearm had been cited in the offense of conviction. That's a much different thing than pretending to get a gun for a crime, or get a gun and then commit a crime later. This offense only requires the falsification of the form. Not an offense, not a firearm to be cited in the offense of conviction. The other point would be that Mason's death was not relevant conduct. The notes on use indicate that whether or not the offenses are related to each other has to be determined based on relevant conduct principles. But here the charge of instance was completely prior to Mason's death, three and a half some odd months. And I think it's also relevant here to recall that at least as far as this trial was concerned, the government conceded, or at least didn't argue, that Mr. Carter's possession of the firearm was unlawful. They'd never made that argument. In fact, they conceded in front of the jury that he could possess the firearm lawfully. He just believed that he couldn't do the background check, so that never enters into it. Third and finally, the government failed to present sufficient evidence to establish that Mr. Carter committed the offense, or that he used the VP9 to do so. With regards to Mr. Carter's involvement in Mason's death, the evidence was that he left work around 4 30, his phone is in the area of his house around 5 30, it leaves, it comes back, he calls 9-1-1. Was there any evidence about an estimated time of death or shooting? I'm not sure when she passed away, I apologize. One of the witnesses testified that she appeared cold, but he also said he'd been home all day and had not heard the bullet fired. So there was no expert testimony, no medical testimony? Not to my recollection, Your Honor. There was no expert testimony about when that occurred. There was evidence that they had had some argument earlier in the day. Mr. Carter had told Miss Mason that he was done with the relationship, but that was the extent of it. With regards to the VP9, the testimony was never, there was no expert who ever testified that the VP9 was the gun that was used to kill Mason. In fact, the testimony was that it could have been the VP9, it also could have been a Glock, a Tankfolio, any number of other guns. In fact, it wasn't even as if the bullet that was recovered from Miss Mason had rifling that was the same as the VP9. The rifling on that bullet was six-groove polygonal rifling, but the expert was not able to testify if it was right or left hand. So if it was right hand, I believe, then that would be consistent with the VP9. If it was left hand, it wouldn't. He couldn't say either way. They could only say it was possible. Counsel, before your time expires, I do want to ask about one of the other issues, which is the suspicious circumstances, the intrinsic evidence. I'm going to have a conversation with opposing counsel about that because I'm a little concerned about that. But in the end, why wasn't it just harmless? You do have the statement of suspicious circumstances, but as to the false statements itself, it seems to me that there was enough other evidence and maybe more than the government needed in order to convict your client. We can have a separate discussion about the murder, but at least as to the false statements, aiding and abetting. All right. So with regards to that, I mean, Appellant's point was that it's extrinsic evidence rather than intrinsic to the offense, but why was it not harmless? It was incredibly... I think in the context of this case, it's incredibly impactful. The government made a point of closing out their case by saying, this firearm was found at the victim's deceased or when we found the deceased. I think that is incredibly prejudicial. A jury walks out and then in the closing, the government argues, he took these guns, he put them on the street. The implication that the government was trying to get the jury to follow was, he got this gun unlawfully and then he committed a murder and therefore he should be punished for that reason. And the jury had no limiting instruction. They had no argument about why they should disregard that. You close on that. I think a jury goes back and it's incredibly prejudicial. I tend to agree it's very prejudicial and I don't know why it was actually... It's one thing to say that the significant other died. It's another thing to say under suspicious circumstances in a gun case. But it seems to me that the jury could have still convicted him based and probably... I mean, even if it was incredibly prejudicial, based on all the other evidence. I think there was texts, there was statements, there was the fact that they were seen with the gun the next day. There's all this other evidence too. So to the extent that you said that could the jury have convicted him? I certainly am not going to argue that that might not be the case, although we did argue the insufficiency of evidence otherwise, but conceding that for this purpose. But they also could not have. And in this circumstance, when the objection to that evidence was raised before a trial, was raised consistently during trial, it shouldn't have come in. It would be one thing if we were arguing this in retrospect, when no objection had been raised. There are other questions? Thank you, Your Honor. Thank you, Counsel. Mr. Prejugal, you may proceed. Thank you, Your Honors, Opposing Counsel. May it please the Court. I'll start with relevant conduct. Essentially Davis, United States v. Davis, tells us relevant conduct also includes, and I'm quoting from 1B1.3A4, any other information specified in the applicable guideline. That takes us to the applicable guideline, which no one disputes in this case, is 2K2.1, which takes us to the cross-reference, which itself is narrowed down to common defendant, common gun. For that reason, Your Honor, the Court can consider how the defendant who unlawfully acquires, that is, comes into possession of that gun, then uses it three and a half months later. That three and a half month period is well within the timeline set out by this Court, in terms of analogous relevant guideline lengths. It's also the example set in application note 14, which has a robbery using the same gun occurring eight months before the felon in possession. What about the distinction that this is an acquisition of a firearm case, as opposed to many of the cases that address this issue, and they are possession, and so it's an ongoing criminal conduct, and this is a terminated act? Your Honor, the distinction that I didn't eloquently make in the brief is that I think the possession is ongoing. The gun itself during trial, this wasn't just a case where we put on evidence of the false statement. We had conduct beforehand leading up to the fact that they were trying to acquire these guns, and we had a conspiracy charge that was the object and purpose of which was to obtain and possess the HK. After the fact, possession of the HK was relevant to the initial 922A6. Does it not matter that the subsequent possession, at least in your theory, was not unlawful in and of itself? It is unlawful in the sense that if he was caught with that gun, he's not allowed to have it, and it would have implicated him. Because of the improper acquisition? Because of the way he purchased it, correct. I concede it's not the same as a felony status. We didn't argue he was a prohibited person because he wasn't. He was on state probation. In his mind, he couldn't get the gun, and so he came up with this illegal scheme. Without that scheme, without obtaining and possessing that HK-49, he couldn't have then used that weapon to kill Sarah. And just to address your question earlier, Your Honor, about why we split out the two different guns, there were actually three guns purchased. One of them wasn't a lie that it was actually being bought for Ms. Hooks. Ms. Hooks actually bought the same exact kind of gun, just a different color, as Ms. Mason. And so we needed the jury to find that as to those two guns, one specifically, the HK-59, was for Carter, and the other was for Mason. Was that an element of the offense? Did you need to include that? Your Honor, I think, so this is kind of, so for example, if no gun was ever transferred, we wouldn't be here because there would be no gun to commit additional crimes with. Well, back up a little, but it's the acquisition, it's the false statement, correct? Correct, Your Honor. So do you need to prove the specific gun to prove this false statement as initial? I mean, put aside the sentencing issue here in this case, if this were just a freestanding false statement. And Your Honor, that's why I focused on the charges here. We have both the false statement and the conspiracy to obtain and possess it using that false statement. And so... Okay, then I'm going to narrow the question even more. What if it was just the false statement count? Do you need to identify that gun? You don't need to identify it, but then Edgar tells us, even if it's not identified in the indictment, does it form the basis of this charge? Yeah, and I'm putting aside the sentencing. Just for the conviction, your position is that you don't need to identify a gun? In this case, we needed to because there were some guns that were legally purchased and some that weren't. But generally, you can prove this crime without having to do that. So you were needing to link up which ones he was trying to purchase? Yes, because they were all put on layaway at the same time and bought at the same time. And nothing would have prevented you from proving the gun at sentencing. Even if you left it out in the conviction, you could have presented testimony, this was the gun that was used. That's correct, Your Honor, because 2K2C1 is a sentencing enhancement. And so as long as we prove same defendant, same gun, we're within 1B1 and then as well within the cross section. I want to ask you about, because I think everything's linked here, but if we don't need to prove the specific gun, why do we need to prove and how is it intrinsic for you to prove that Mason died under suspicious circumstances? That to me is, because we laid out in VACA all of the different, and this doesn't fall into any of those categories. Your Honor, I think it explains why police committed a further investigation. So if they had just arrived and there was a sudden death and that was it, there'd be no reason to investigate any further. But why under suspicious circumstances? And what I'm really asking is how is it intrinsic to the crime? Because VACA was really clear that it has to be intrinsic to the crime and Fleck was as well. This goes back 20 something years and maybe it's intrinsic to the investigation, but I don't understand how it's intrinsic to the crime. And I don't think her suspicious death proves any element of the crime, but her suspicious death explains why the crime was uncovered. And so I think the cases that say we're allowed to explain why police are there, why they're conducting a further investigation, for example, this falls within, I'm blanking on Harris, where a man was arrested in the context of a murder investigation and the prosecutor made similar statements, but they avoided the use of the word murder. We never got into anything about how this crime was committed. We never got into anything about who committed this crime. We never even got into anything about what suspicious meant. How is the investigation though tied up with the crime? I mean, because VACA in our early cases, and we got to go with the earliest case, tend to say it needs to be intrinsic to the crime itself, not to the investigation. And Fleck was about the investigation. Yes, Your Honor. The investigation is tied up with the crime because they found evidence of underlying crime as a result of looking into this suspicious death. And so because the death was suspicious, they searched the house. They then found the Glock. Actually, I should say, the Glock was found on the dead body. So they have a dead body with a gun that fell out of it. So you think that if somebody commits a crime, they need to foresee an investigation and that becomes part of the crime? No, I'm just saying under these circumstances where we find evidence as a result of this sudden death investigation, of this suspicious sudden death investigation, we're allowed to tell the jury we're here for a suspicious sudden death. Although that's what we decide. You're not necessarily allowed. We need to decide. No, right. Exactly, Your Honor. But that's your view. That's the difference too. Yes, Your Honor. Precisely. I'm not deciding it for you by any means. I was told by my colleagues to mention harmless error, so I'm going to mention harmless error. I think that's your better argument, quite honestly, especially in light of Fleck. Yes, Your Honor. I think, look, police investigate suspicious activity all the time. That's what they do. I think Judge Autry's point at the pretrial conference was, look, if you're going to concede that her sudden death comes in, if you're going to concede that the gun comes in, if you're going to concede that the gun being her Glock 42 that fell out of her pocket, if you're going to concede that his gun was never found, then adding the word suspicious to it is not going to make a difference one way or the other. So we have a kind of different situation here. And so that kind of takes the sting out of it as well, Your Honor. Takes the sting out of it, but then also on the false statements. I mean, I sort of talked about this with opposing counsel. I mean, do you think that this qualifies as overwhelming evidence as to the false statements? That's what we care about. Would the jury have convicted him in the absence of the suspicious circumstances? Yes, Your Honor. You went through some of it. We had a cooperator that essentially laid out the whole scheme, and then his testimony was corroborated extensively. So we have text messages from Darius Carter on June 2nd and beyond, reaching out to various people saying, can you get me a gun to gift to Sarah? Do you have a clean background? Things like that, which corroborated the idea that this conspiracy started then. We have text messages between Darius and our cooperator. Then we have evidence from their bank accounts linking them to actually spending money on the gun, which again is why the gift defense didn't work. It was brought up, but it didn't work because we could prove, and we did prove, they spent their own money getting this gun. And then the after-the-fact possession, which I think ties in to sentencing, is we proved an uninterrupted possession of that HKVP9 by Darius Carter. And then, Your Honor, to bring it back to your question about the time of death, they had been texting that morning, and we introduced those texts at sentencing. So she was alive that day. I believe, I can't remember exactly where, but there's evidence in the record that she was preparing to leave him. And so our theory was always that he confronted her when he came back from work. So our theory was he killed her some period at 5.30 and then tried to cover his tracks. And through cell phone evidence and other evidence, we knew he disposed of clothing and things like that. And then we tied that gun to him because he had access to the same kind of and then the gun itself was the kind of gun that could have been used. Was there a state investigation where the government could have called in witnesses or the defense could have poked holes in that investigation? There wasn't, at the time, a parallel state investigation. No one investigated this as a murder? That's not, let me put it this way. I think the federal, the state was investigating it, but it was nowhere near bringing charges, let me put it that way, for the murder. Counsel, looking at your summary of the argument in your brief, you say the government proved Carter murdered Sarah with the straw purchased VP-9. Yes, Your Honor. What are the facts that you think were proven that support that statement? So one, Your Honor, we had testimony that- In light of counsel pointing out the ballistics testimony issue. Yes, Your Honor, we had a ballistics expert and he testified essentially that this could be the gun that killed Sarah. This was, there was no evidence of any sort of domestic, or excuse me, of any sort of break-in or anything like that. So somebody close to her killed her. There was motive that had recently broken up. And may I, I see I'm out of time, Your Honor, may I finish? You may finish. There was evidence that had recently broken up. And then the kind of bullet pulled from the back of Sarah's head was a 115 grain full metal jacket. And we had evidence from the local shooting range that as recently as June, during the time of the earlier conspiracy, he had bought a 115 grain full metal jacket. So he had those kinds of bullets in his possession. And then her gun that was found on her could not have done it. And so somebody who loves this gun, who has it continuously and then it goes missing, all those facts together get us there by preponderance, Your Honor. If there's nothing further, we'd ask that the judgment be affirmed. All right, thank you very much. Thank you, Judge. Counsel, you have 38 seconds. Take two minutes to conclude. Very briefly, Your Honor. The government's making the point that, or they're alleging that Mr. Carr's continued possession of the VP9 was unlawful because he unlawfully acquired it. That was never charged, proven, and I'm not certain exactly what statute would have made him a prohibited person under those circumstances. In fact, again, at trial, the government's position appeared to have been in front of the jury that his possession of the firearm was lawful. So I'm not entirely sure how that argument works. And then, Judge Shepherd, with regards to your question, your final question there. When you asked what's the evidence that the gun was used, the response was there was expert testimony that it could have been. That's a possibility. That is not a preponderance of the evidence. And the idea that because Mr. Carter did not give the government, essentially, the gun, didn't tell them where it was so they could find it, therefore he must have disposed of it, and therefore he must have disposed of it because he used the gun, is an incredible stretch. It is stacking inference upon inference, none of which are supported. Was there testimony or evidence about the nature of the ballistics? In other words, whether the bullet would have come from an older or newer gun? There was, in fact, Your Honor. Yes, the testimony was that, so the VP9 at this point would have been fairly new. It had been purchased three and a half months, purchased new three and a half months prior to Mason's death. The testimony was that the bullet had been fired from a gun, that the rifling was shallow, which indicated that the barrel had been thoroughly used. Was there testimony about what that means, thoroughly used? No, but certainly it indicated that it was an older gun that had been fired several times, and there was no evidence that the VP9 would qualify. So, again, we would ask that you overturn his convictions, remand him for a new trial, or on the alternative, remand him for resentencing. All right. Thank you very much, counsel. The case is submitted, and the court will render a decision in due course. And with that, you may stand aside.